**Gary CONDIT, Plaintiff,**

v.

**Dominick DUNNE, Defendant.**

**No. 02 Civ. 9910(PKL).**

United States District Court,
S.D. New York.

Dec. 8, 2004.

L. Lin Wood, Katherine Ventulett, L. Lin Wood, P.C., Atlanta, GA, Mark E. Goidell, Lazer, Aptheker, Rosella & Yedid, P.C., Melville, NY, for Plaintiff.

Paul V. Licalsi, Devereux Chatillon, Rachel G. Balaban, Sonnenshein Nath & Rosenthal LLP, New York City, for Defendant.

## OPINION AND ORDER

LEISURE, District Judge.

Defendant, Dominick Dunne, brings this motion pursuant to Federal Rule of Civil Procedure ("FRCP") 37(a) to compel plaintiff, Gary Condit, to provide deposition testimony regarding Condit's 1) sexual relationship with Chandra Levy, Joleen Argentini McKay and Anne Marie Smith ("sexual relationships"); 2) real property interests, financial, and employment information ("financial information"), and; 3) belief regarding which specific portions of the statements alleged to be defamatory in plaintiff's complaint actually constitute a criminal accusation. Plaintiff opposes disclosure claiming the information is irrelevant and protected by plaintiff's right to privacy under the United States, California, and New York Constitutions. Plaintiff cross-moves for an order of protection pursuant to FRCP 26(c)(4) barring defendant from inquiring into these areas during discovery.

## FACTUAL BACKGROUND

Plaintiff, former United States Congressman for the 18th District of California, Gary Condit, brings this defamation action alleging defendant, writer Dominick Dunne, made slanderous statements criminally implicating Condit in the disappearance and death of former Bureau of Prisons employee, Chandra Levy. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship between the parties exists and the amount in controversy exceeds seventy-five thousand dollars ($75,000).

Plaintiff alleges slander *per se* arising from: 1) Defendant's statements on the December 20, 2001 broadcast of the *Laura Ingraham Show*, wherein defendant allegedly criminally implicated Condit in the disappearance and death of Ms. Levy (Plaintiff's First Amended Complaint ("Am. Compl.") ¶¶ 20–24); 2) Subsequent reporting of the aforementioned statements in articles in major national newspapers, tabloids, and internet websites (Am. Compl. ¶ 27); 3) Defendant's repetition of such statements at Wendy Stark's December 30, 2001, Los Angeles, California dinner party attended by many prominent guests (Am. Compl. ¶¶ 28–29); 4) Defendant's repetition of allegations that Condit was involved in a motorcycle gang, causing Levy's disappearance, and that Dunne was working with authorities on the matter during a January 2002 interview with Entertainment Tonight Online staff writer, Paula Cohn, published online on January 18, 2002 (Am. Compl. ¶ 30); 5) Defendant's repetition of the statements made on the *Laura Ingraham Show* at Casey Ribicoff's New York City dinner party on January 24, 2002, attended by many prominent guests (Am. Compl. ¶ 31–32); 6) Defendant's statements made on the February 13, 2002 national and international broadcast of CNN's *Larry King Live*, realleging Condit's involvement with motorcycle gangs and realleging the statements made on the *Laura Ingraham Show* (Am. Compl. ¶ 33); and 7) Defendant's statements to *The Boston Herald* and *USA Today* after police found

Ms. Levy's remains, stating that the discovery did not exonerate Condit.

Plaintiff alleges the above statements constituted slander *per se* because they charge Condit with serious crimes involving moral turpitude. Further, plaintiff alleges that Dunne's statements directly and proximately led the public to believe Condit was guilty of criminal involvement in the disappearance and death of Ms. Levy, and caused Condit's reputation to suffer accordingly. Condit alleges he suffered stress, emotional distress and mental pain and suffering, adverse physical consequences, public hatred, contempt and ridicule, all as a direct and proximate result of Dunne's statements. Finally, plaintiff pleads special damages as he has suffered permanent impairment to his ability to obtain gainful employment from third parties. Plaintiff seeks one million dollars ($1,000,000) in compensatory damages, ten million dollars ($10,000,000) in punitive damages, plus costs and attorneys' fees.

The statements at issue are excerpted in this Court's Opinion and Order issued on April 27, 2004, denying in part and granting in part defendant's motion to dismiss, familiarity with which is assumed. *Condit v. Dunne,* 317 F.Supp.2d 344 (S.D.N.Y.2004). However, for the sake of clarity, the facts relevant to the instant motion are restated by the Court below.

### A. *Ms. Levy's Disappearance*

On or about May 1, 2001, Ms. Levy, a 24–year old employee of the United States Bureau of Prisons, disappeared from her downtown Washington, D.C. apartment. (Am. Compl. ¶ 13.) On May 10, 2001, plaintiff publicly acknowledged that he and Ms. Levy were friends. (Am. Compl. ¶ 15.) As law enforcement investigated Ms. Levy's disappearance, a media frenzy ensued which focused in no small part on speculation about the relationship between plaintiff and Ms. Levy. (Am. Compl. ¶¶ 16–17.)

### B. *Defendant's Statements During the Pending Investigation*

Defendant, a resident of New York, is a special correspondent for *Vanity Fair* magazine, an author, and a television commentator. (Am. Compl. ¶¶ 5–7.) With the disappearance of Ms. Levy still under investigation, defendant spoke publicly on five occasions about plaintiff's possible criminal involvement in Ms. Levy's disappearance. (Am. Compl. ¶¶ 18–20, 28–33.)

### 1. *The Laura Ingraham Show*

On December 20, 2001, defendant appeared on *The Laura Ingraham Show,* a nationally syndicated radio talk show. Plaintiff includes a transcript of the entire interview in his complaint. (Am. Compl. ¶ 20.) The Court attached a transcript of the interview on *The Laura Ingraham Show* as an appendix to its April 27, 2004 Opinion and Order. *See Condit,* 317 F.Supp.2d at App.

The fully documented interview speaks for itself. *Id.* In short, the radio host, Laura Ingraham, introduces defendant at the outset, noting that defendant is from *Vanity Fair* magazine, that defendant has followed the Chandra Levy case, and that defendant has interesting stories to tell related to that case. Defendant then describes a series of alleged events related to plaintiff and Ms. Levy, in interview style, with Ingraham interjecting intermittently.

Defendant states that he received a call from a person from Salinas, California, who describes himself as a "horse whisperer" or animal behaviorist. Defendant then repeats the substance of the conversation between himself and the horse whisperer. The horse whisperer told defendant that he travels in the Middle East, and that he had met an Arab man at a party who claimed to know how Ms. Levy disappeared. Defendant states that the horse whisperer described the Arab man as a "procurer," who provided the sexual services of young foreign women in the Middle East and at the "Middle Eastern Embassy" in Washington. Defendant then states the following:

> But according to what the procurer told the horse whisperer who told me, is that Gary Condit was often a guest at some of the Middle Eastern embassies in Washington where all these ladies were, and that he had let it be known that he was in a relationship with a woman that was over,

but she was a clinger. He couldn't get rid of her. And he had made promises to her that he couldn't keep and apparently she knew things about him and threatened to go public. And at one point he said this woman is driving me crazy, or words to that effect. And I wrote all this down at the time. And what the horse whisperer said the procurer said is by saying that, he created the environment that led to her disappearance and she shortly thereafter vanished. And as the horse whisperer said, as he lives in the Middle East a great deal of the time, it's very easy for them to make people disappear. He said that she was put in a limousine, and this procurer claims that he saw her being put on a plane, one of these big commercial-sized private planes that the Arabs have, rich princes, and those people.... And he said, let me put it this way. She wasn't walking. (Am. Compl. ¶ 20 at 10.) . . . .

[Ingraham:] And what does [the procurer] think happened to her after that?

[Dunne:] What he said he thought happened to her is that she was dropped at sea.

[Ingraham:] In the Atlantic? Over the Atlantic?

[Dunne:] Yes.

(Am. Compl. ¶ 20 at 14.) Defendant then states that "I heard all these details, okay? I mean I can't vouch for any of this." (Am. Compl. ¶ 20 at 12.) Defendant agrees with Ingraham's description of the horse whisperer as a "respectable individual" (Am. Compl. ¶ 20 at 12.), but notes twice that the horse whisperer changed his story. (Am. Compl. ¶ 20 at 8, 16.)

During the next portion of the interview, defendant describes his subsequent contact with the Federal Bureau of Investigation ("FBI"), and his effort to meet the procurer, which was fruitless. Defendant states that at the time of the interview he did not know the status of any FBI investigation into the story told to him by the horse whisperer. For the remainder of the interview defendant and Ingraham engage in speculation about the story. For example, Ingraham asks defendant, "does this surprise you at all, I mean, if indeed some version of this is the truth?" Defendant does not directly answer Ingraham's question, which is embedded in a lengthier statement by Ingraham. (Am. Compl. ¶ 20 at 18.) Also for example, defendant later states, "And, you know, if it is indeed true that [Condit] is a welcomed guest at the Middle Eastern embassies, I mean what is a guy on the House Intelligence Committee doing at those embassies?" (Am. Compl. ¶ 20 at 20.) Defendant and Ingraham agree that the horse whisperer's story makes "beautiful sense." (Am. Compl. ¶ 20 at 18–19.)

### 2. *The Dinner Parties*

After appearing on *The Laura Ingraham Show,* defendant repeated the statements he had made on the show at two dinner parties, one in California and one in New York. (Am. Compl. ¶¶ 28–29, 31–32.) The complaint does not describe any particular statements defendant made at these parties.

### 3. *Entertainment Tonight Online*

In January 2002, Paulette Cohn of *Entertainment Tonight Online* ("ET Online") interviewed defendant. (Am. Compl. ¶ 30.) On January 18, 2002, Cohn's internet column included the following:

"Gary Condit rides with the Hell's Angels as a motorcyclist," Dunne revealed. "He rides with a Haitian motorcycle group in Washington, and I went on 'Larry King' and said that I thought that the reason she left was that she'd gotten on the back of a motorcycle—somebody doing a favor for him—and had been taken away."

The crime writer said that he the [*sic*] received "a call from a man in Hamburg, Germany, who had just come from the Middle East and had a video of me on 'Larry King.' He says, '[You're wrong,] that's not how it happened'—and [that] he knew how it happened!" With the investigation still pending, Dunne could not reveal any more information, but noted that he's working with authorities in Washington, D.C.

(Am. Compl. ¶ 30.)

### 4. *Larry King Live*

On February 13, 2002, defendant appeared on the television show *Larry King Live* for

the second time. He had previously appeared on the show and theorized that Ms. Levy had "gone off on the motorcycle of one of Condit's motorcycle friends." (Am. Compl. ¶ 33.) During the February 13 interview on *Larry King Live*, defendant repeated an abbreviated version of the horse whisperer/procurer story that he described on *The Laura Ingraham Show* in December 2001. Defendant also stated, "I believe firmly that he knows more than what he has ever said." (Am. Compl. ¶ 33.)

### C. *Defendant's Statements After Ms. Levy's Remains Were Found*

On May 22, 2002, Ms. Levy's remains were found in Rock Creek Park in Washington, D.C. (Am. Compl. ¶ 34.) Shortly after Ms. Levy's remains were recovered, defendant was interviewed separately by reporters for the *Boston Herald* and *USA Today*. (Am. Compl. ¶¶ 35–36.) The "Inside Track" column of the *Boston Herald* subsequently reported, under the title "Condit get a Dunneing," that defendant "still believes Washington intern Chandra Levy was the victim of foul play and the discovery of her body doesn't let Congressman Gary Condit off the hook." (Am. Compl. ¶ 35.) *USA Today*, in its print version and on its website, subsequently published a story titled "Dunne's trail leads to the elite of murders." (Am. Compl. ¶ 36.) *USA Today* quotes defendant as saying "I don't think [Condit] killed her. I think he could have known it was going to happen." (Am. Compl. ¶ 36.)

### PROCEDURAL POSTURE

On April 27, 2004, defendant Dunne's motion to dismiss was denied in part and granted in part. Specifically, this Court found that the First Amendment does not provide defendant with blanket protection because his statements could be construed as constituting false assertions of facts rather than mere speculation based on publicly available facts. "Defendant did not merely comment on a public controversy, but also added false assertions of fact to the public controversy" and therefore, partial denial of his motion to dismiss did not offend the First Amendment's protection of speech regarding public officials and matters of public concern. *Condit*, 317 F.Supp.2d at 372.

Subsequent to the April 27, 2004 order, Defendant answered the complaint, the parties filed a case management plan and commenced taking depositions during discovery. The parties also entered into a Consent Protective Order, governing confidential information which this Court so ordered on July 12, 2004. The issues premising the instant motion arise from the September 27, 2004 deposition of plaintiff Condit. Specifically, plaintiff Condit refused to answer questions relating to: 1) his sexual relationships; 2) the specific lines in Dunne's statements that were defamatory, and; 3) his financial status. Each is discussed in turn below. This Court heard oral argument from both parties on these issues on November 4, 2004.

### DISCUSSION

### A. *Legal Standards*

#### 1. *Motion to compel discovery*

FRCP 37 provides in pertinent part that "a party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling disclosure or discovery" by motion if the parties have conferred in good faith and the opposing party "fails to make a disclosure required by Rule 26(a)." Fed.R.Civ.P. 37(a). Further, "evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose." Fed.R.Civ.P. 37(a)(3).

#### 2. *Relevance during discovery*

FRCP 26, in turn, states that a party may discover "any matter, not privileged, that is relevant to the claim or defense of any party.... Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R.Civ.P. 26(b)(1). Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept. *A.I.A. Holdings S.A. v. Lehman Bros.*, No. 97 Civ. 4978, 2000 WL 763848, at *2 (S.D.N.Y. June 12, 2000) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57

L.Ed.2d 253 (1978)). Once "'any possibility' of relevance" sufficient to warrant discovery is shown, the burden shifts to the party opposing discovery to show the discovery is improper. *Id.* at *3; *see Melendez v. Greiner,* No. 01 Civ. 7888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003) ("[W]here a party resists discovery of certain information, the burden is on that party to clarify and explain precisely why its objections are proper.") (citation omitted). Generally, discovery is only limited when "'sought in bad faith, to harass or oppress the party subject to it, when it is irrelevant,'" or privileged. *Melendez,* 2003 WL 22434101, at *1 (quoting *In re Six Grand Jury Witnesses,* 979 F.2d 939, 943 (2d Cir.1992)).

### 3. *Order of protection*

FRCP 26(c) can provide a defamation plaintiff with some protection from discovery that may result in "oppression." Fed. R.Civ.P. 26(c). Rule 26(c) authorizes a court to institute an order of protection limiting the permissible uses of discovered material. In *Ramsey v. NYP Holdings,* No. 00 Civ. 3478, 2002 WL 1402055, at *4 (S.D.N.Y. June 27, 2002), the court held that information garnered from the parents' private investigation of JonBenet Ramsey's death was relevant. However, the court instituted an order of protection limiting production to defense counsel and trial team and prohibiting use of the information for any other purpose than the litigation before the court. *Id.* at *13. The court premised its decision on the potential that the information would expose the Ramseys to criminal liability. *Id.* The court also stated that a member of the press as defamation defendant should not be able to use his "own allegedly defamatory conduct ... as a means of ferreting out further information from the arguably injured party for subsequent publications." *Id.* (A member of the press has "no right to demand that the court processes triggered by his conduct will be made available to him for journalistic endeavors irrespective of the legitimate privacy interests of his adversary.").

### 4. *Defamation, Slander* per se

In the instant case, plaintiff alleges slander *per se* in that Dunne, a member of the press, defamed a then public official, now public figure, Condit, with statements made regarding a matter of public concern, the disappearance and death of Ms. Levy. Applying an interest-balancing analysis, the Court determined that California law governs the substantive issue of defamation. *Condit,* 317 F.Supp.2d at 355. Under the facts above, plaintiff must prove by clear and convincing evidence that the statements 1) were of and concerning plaintiff, *Rosenblatt v. Baer,* 383 U.S. 75, 80–83, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *Blatty v. New York Times Co.,* 42 Cal.3d 1033, 232 Cal.Rptr. 542, 547, 728 P.2d 1177 (1986); 2) implied a false statement of fact, *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), and; 3) were made with actual malice or reckless disregard to the truth, *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See Condit,* 317 F.Supp.2d at 358–59. Slander *per se* is applicable here as plaintiff alleges defendant's statements charged him with a crime. *Rodriguez v. Panayiotou,* 314 F.3d 979, 983 (9th Cir.2002); *Condit,* 317 F.Supp.2d at 360. Slander *per se* provides an assumption that plaintiff was damaged, which defendant must overcome. *See Condit,* 317 F.Supp.2d at 360. Determination of actual malice or reckless disregard to the truth is a subjective, state-of-mind inquiry. *Harte–Hanks Comm., Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("The standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of ... probable falsity.") (internal citation omitted) (alteration in original). Because of this subjective inquiry, evidence "of specific misconduct that tends to prove not only the truth of the libel's charge but also the absence of actual malice," is admissible. (Defendant Dominick Dunne's Reply Memorandum of Law in Support of His Motion to Compel Discovery and for Court Supervision of Plaintiff Gary Condit's Deposition ("Def.'s Reply") at 5 (quoting *Sharon v. Time, Inc.,* 103 F.R.D. 86, 92 (S.D.N.Y.1984)).) Moreover, under California law, defendant has available to him the defense of substantial truth, which must be proven by a preponder-

ance of the evidence. *Campanelli v. The Regents of the Univ. of California,* 44 Cal. App.4th 572, 51 Cal.Rptr.2d 891, 897 (Ct.App. 1996) (quoting *Emde v. San Joaquin County Cent. Labor Council,* 23 Cal.2d 146, 160, 143 P.2d 20 (1943) ("It is generally agreed that it is not necessary to prove the literal truth of an allegedly libelous accusation in every detail, so long as the imputation is substantially true so as to justify the 'gist' or 'sting' of the remark.")).

### 5. *Privilege—right to privacy*

■ The parties disagree as to whether New York or California law governs plaintiff's assertion of an evidentiary privilege arising from his right to privacy, but do agree that a conflict exists. (Transcript of November 4, 2004, Oral Argument ("Oral Argument Tr.") at 32.) A federal court sitting in diversity applies the conflict of law rules of the forum state. Fed.R.Evid. 501; *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York courts initially evaluate whether a true conflict between the laws of different states exists. *Norlin Corp. v. Rooney, Pace, Inc.,* 744 F.2d 255, 264 (2d Cir. 1984) ("[W]hen the interests of only one state are truly involved, the purported conflict is purely illusory. Thus, there is no reason why the law of the forum state should not control."). If a true conflict exists, New York courts then apply an interest-balancing test to determine which state has the greatest interest in applying its law. *Tartaglia v. Paul Revere Life Ins. Co.,* 948 F.Supp. 325, 326–327 (S.D.N.Y.1996) ("New York choice of law gives 'controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.' ") (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 283–84 (1963), and *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065, 1069 (1994)); *see also AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270–71 (2d Cir.1992) (applying New York's interest analysis to determine that, because privilege is a conduct-regulating rule, the law of the state where the tort occurred should apply).

In balancing the competing interests, "[t]he Court must evaluate the nexus between each jurisdiction and the controversy in light of the policies and purposes to be vindicated by the conflicting laws." *David Tunick, Inc. v. E.W. Kornfeld,* 813 F.Supp. 988, 994 (S.D.N.Y.1993).

In the privilege context, New York courts have recognized state interest in several contexts: 1) the state where the allegedly privileged communication was made; 2) the state where discovery is sought and evidence will be admitted; 3) the state of the parties' citizenship; 4) the state where the suit was filed; 5) the state whose law controls the substance of the litigation, and; 6) the state where the offense giving rise to the litigation took place. *See AroChem Int'l,* 968 F.2d at 271; *Satcom Int'l Group PLC v. Orbcomm Int'l Partners, L.P.,* 1999 WL 76847, at *1, 1999 U.S. Dist. LEXIS 1553, at *2–4 (S.D.N.Y.1999) ("Most courts apply the privilege law of the state that would be chosen under the choice-of-law rules used by the state where the court sits . . . . A respectable argument may be made for applying the law of the state where the deposition will be offered into evidence.") (quoting 3 Weinstein's Federal Evidence § 501.02(3)(c)(i)–(ii)); *Elliott Assocs., L.P. v. Republic of Peru,* 176 F.R.D. 93, 96 (S.D.N.Y.1997) ("New York courts apply the law of the place where the evidence in question will be introduced at trial, or the location of the discovery proceeding itself.") (quoting *Drimmer v. Appleton,* 628 F.Supp. 1249, 1250 (S.D.N.Y. 1986) (no conflict issue where trial and deposition in same state)).

■ New York courts do not recognize a privilege which would protect plaintiff from giving deposition testimony infringing on his right to privacy. New York, of course, recognizes a right to privacy arising from its own constitution and the United States Constitution. *See People v. Onofre,* 72 A.D.2d 268, 424 N.Y.S.2d 566, 568 (App.Div.1980), *aff'd,* 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (1980) ("Personal sexual conduct is a fundamental right, protected by the right to privacy."); *see, e.g., Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35

L.Ed.2d 147 (1973); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). However, New York courts have not extended this right to create a evidentiary privilege. *Cf. Weinstein v. Friedman*, No. 94 Civ. 6803, 1996 WL 137313, at *20–21 (S.D.N.Y. Mar. 26, 1996); *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 703 (1993) (refusing to extend the right to privacy as it is governed exclusively by N.Y. Civ. Rights Law §§ 50, 51).[1]

Further, this District has adamantly refused to allow a litigant to invoke privilege to protect discovery of information relating to the matter the litigant put directly at issue. *Sanofi–Synthelabo v. Apotex, Inc.*, 299 F.Supp.2d 303, 308–09 (S.D.N.Y.2004) (finding it unfair for complainant to assert contentions to the court and then to rely on privilege to block disclosure of materials that might disprove or undermine those contentions). This holds true in defamation cases. *Cf. Weber v. Multimedia Entm't*, No. 97 Civ. 0682, 1997 WL 729039 (S.D.N.Y. Nov. 24, 1997) (allowing discovery of sexual history of plaintiff as to damages in defamation case, though plaintiff claimed irrelevancy).

■ The right to privacy is explicitly codified in California's Constitution. Cal. Const. art. 1, § 1; *Pearce v. Club Med. Sales, Inc.*, 172 F.R.D. 407, 410 (N.D.Cal.1997). California courts have extended the right to privacy to encompass a privilege justifying a litigant's refusal to answer deposition questions unreasonably intruding on this right. *Pearce*, 172 F.R.D. at 410; *Britt v. Superior Court of San Diego*, 20 Cal.3d 844, 856 n. 3, 143 Cal.Rptr. 695, 574 P.2d 766 (1978). The right extends to personal financial information and private sexual information. *Pearce*, 172 F.R.D. at 410–11 (sexual information); *Moskowitz v. Superior Court of Los Angeles*, 137 Cal.App.3d 313, 315–16, 187 Cal.Rptr. 4 (1982) (financial information). When this privilege conflicts with the need for truthful discovery, California courts apply a balancing

test to determine whether the public interest in discovery outweighs the private interest in the privilege. *See Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633, 668 (1994) ("Even at the risk of losing some degree of flexibility in decisionmaking, a constitutional standard that carefully weighs the pertinent interests at stake in an ordered fashion is preferable to one dominated by the vague and ambiguous adjective 'compelling.' "). Where the balance is on making the information discoverable, the scope of discovery must be narrowly drawn in order to least compete with the right to privacy. *Moskowitz*, 137 Cal.App.3d at 315–16, 187 Cal.Rptr. 4 (citing *Britt*, 20 Cal.3d at 856, 859, 143 Cal.Rptr. 695, 574 P.2d 766).

B. *Defendant's Instant Motion to Compel and Plaintiff's Cross–Motion for Protective Order.*

1. *Defendant is allowed to discover information regarding plaintiff's sexual relationships to the extent the information sought is relevant and the questions are not merely intended to harass or oppress Condit.*

a. *Condit's Assertion of Privilege is Without Merit*

■ Applying New York's balancing test, New York's privilege law applies in this case, and as explained above, New York does not recognize an evidentiary privilege based on an individual's right to privacy. California's interest in this litigation is the underlying slander claim and that Condit is a California resident. However, that California law will govern the underlying claim does not preclude this Court from finding that New York law governs assertions of evidentiary privilege. *Satcom Int'l Group*, 1999 WL 76847, at *1, 1999 U.S. Dist. LEXIS 1553, at *2 ("Although it appears that New York law will otherwise apply to the substantive claims in this action ... a separate inquiry into which state's law will apply is necessary with re-

---

1. It is also noteworthy that plaintiff cites no New York case law supporting an evidentiary privilege stemming from the right to privacy. (*See* Plaintiff Gary Condit's Memorandum of Law in Opposition to Defendant's Motion to Compel Discovery and in Support of Plaintiff's Cross–Motion for Protective Order ("Pl.'s Opp'n").)

spect to an assertion of the attorney-client privilege."); Defendant's Memorandum of Law in Support of Defendant Dunne's Motion to Compel Discovery and for Court Supervision of Plaintiff Gary Condit's Deposition ("Def.'s Mem.") at 15 n. 11. New York courts applying this balancing test have looked at whether the person asserting the privilege would have reasonably expected the privilege to apply in a New York court. *Tartaglia*, 948 F.Supp. at 326–327 (finding that a doctor's medical records were protected under New York privilege law because the doctor practiced in New York, his hospital was a New York corporation, and all records were created and maintained in New York, thus creating an expectation that the records would be subject to New York privilege law, despite Ohio law governing the substantive issues of the litigation). Here, Condit could not reasonably have expected that his conduct in his personal affairs would be protected by California's privacy privilege because the alleged conduct did not occur in California, but rather primarily occurred in and around Washington, D.C. Further, Condit sued Dunne in a federal court with New York as its forum state. Therefore, Condit should have expected his deposition would be taken in New York, the evidence would be admitted in New York and New York's conflict of law rules would apply under *Klaxon*. New York has a compelling interest in ensuring its citizens sued in its forum state are allowed full and accurate discovery in order to properly defend themselves in the suit. Defendant Dunne did not ask to be sued, and plaintiff Condit should not be allowed to use the court system as both a sword and a shield.

Further, even if California's privacy privilege did apply, it would not apply so broadly as plaintiff avers. California courts balance five factors when determining whether the state's interest in broad discovery to reach a truthful outcome of the case overrides the individual's fundamental privacy interest:

(1) the probable encroachment of the individual's privacy right if the contested action is allowed to proceed, and the magnitude of that encroachment; (2) whether the encroachment of the privacy right would impact an area that has traditionally been off limits for most regulation; (3) whether the desired information is available from other sources with less encroachment of the privacy right; (4) the extent to which the exercise of the individual's privacy rights impinges on the rights of others; and (5) whether the interests of society at large encourage a need for the proposed encroachment.

*Pagano, M.D. v. Oroville Hosp.*, 145 F.R.D. 683 (E.D.Cal.1993), *overruling on other grounds recognized by, Jackson v. County of Sacramento*, 175 F.R.D. 653, 654 (E.D.Cal. 1997); *compare Pearce*, 172 F.R.D. at 407 (prohibiting discovery as to plaintiff's sexual practice with her husband where plaintiff alleged she contracted food poisoning at defendants' resort and defendants presented scant evidence that sex was an alternate cause for plaintiff's injuries) *with Gonzalez v. Superior Court of Los Angeles County*, 33 Cal.App.4th 1539, 39 Cal.Rptr.2d 896 (Cal.Ct. App.1995) (compelling discovery where plaintiff's assertion that, to disclose the identity of the person who handed her evidence of sexual discrimination would invade that person's privacy interest and result in negative consequences was pure speculation).

■ While the questions regarding plaintiff's personal relationships will likely encroach on his right to privacy, the information regarding Ms. Levy is available from no other source known to defendant. Further, plaintiff's exercise of his privacy rights directly impinges on the defendant Dunne's right to a fair trial. Defendant has the right to explore avenues of discovery that could reasonably lead to admissible information regarding any of plaintiff's claims or defendant's possible defenses. Fed.R.Civ.P. 26(b)(1). To deny defendant access to any information that may support a defense of substantial truth would deny defendant his right to due process. The public interest in discovery vastly outweighs plaintiff's privacy interest.

Plaintiff need not despair, however, as his fears of overly salacious questioning may be quelled through a relevance inquiry, as discussed below.

### b. Relevancy of the information sought

Defendant argues that Condit's sexual relationships are relevant to Dunne's state of mind regarding a determination of actual malice or reckless disregard for the truth. Defendant claims his statements were premised on his belief that Condit had "never come clean" regarding his relationship with Ms. Levy. Specifically concerning Ms. Smith, Dunne asserts that her civil complaint against Condit for allegedly urging her to sign a false affidavit denying their affair was widely reported and led Dunne to make the statements at issue. These circumstances combined led to Dunne's allegation that Condit may have created the circumstances leading to Ms. Levy's disappearance because he wished to end the relationship. Further, Dunne contends that this discovery will support a potential defense of substantial truth. Condit's relationship with other women is allegedly relevant in this regard because it evidences a pattern of behavior regarding his requirement that his female companions carry no identification with them when meeting him. Ms. Levy was not carrying identification when she disappeared. Dunne further claims he can use this discovery to impeach Condit, as showing he lied to authorities, the press, and the Levy family regarding all of these relationships. Dunne also alleges these relationships mitigate any damage to Condit's reputation allegedly caused by Dunne's statements.

Plaintiff counters that defendant cannot, in good faith, claim substantial truth of his statements because Dunne allegedly admitted in deposition that the story he relayed was false. Concerning the relevance of the relationships as to Dunne's state of mind, plaintiff claims the subjective actual malice inquiry only allows discovery pertaining to the specific statements. Because here, Condit only challenges the statements as to their criminal implications and not their sexual implications, plaintiff argues defendant cannot delve into any sexual relationships. Plaintiff argues specific acts are only relevant to mitigate damages if the acts are directly related to the precise libelous statements—here Condit's alleged criminal involvement in the disappearance and death of Levy.[2] Finally, at oral argument before this Court on November 4, 2004, plaintiff made a slippery slope argument, intimating that to allow Dunne access to any information regarding Condit's personal, perhaps sexual, relationships would allow him to ask lascivious questions completely irrelevant to the instant matter.[3] For this reason, plaintiff's counsel urged the Court to draw the line of discovery at the bedroom door, prohibiting defendant Dunne from entering that realm. (Oral Argument Tr. at 35.)[4]

2. Plaintiff also argues the relationships are not relevant for impeachment purposes because defendant cannot use extra-marital affairs to impeach credibility as it is more prejudicial than probative. The Court rejects this argument out of hand as it is a semantic mischaracterization of defendant's wish to use the information for impeachment. (Def.'s Reply at 5 n. 7)

3. See Oral Argument Tr. at 19–21. Plaintiff's counsel opined that defense counsel wished to ask plaintiff Condit questions such as whether Condit had sexual intercourse with Ms. Levy, Ms. McKay, Ms. Smith, as well as "How often do you have sexual intercourse with your wife? Did you have sexual relations with a male Caribbean prostitute? Are you bisexual? Have you ever engaged in homosexual acts?" or "Did you have oral sex with Chandra Levy? With Anne Marie Smith? What positions did you use? What were you wearing?" Id.

In fact, defendant's questions were not so provocative. Plaintiff refused to answer questions such as: "Did you have a sexual relationship with Ms. Levy?" (September 29, 2004 Transcript of the Deposition of Plaintiff Gary Condit ("Condit Depo. Tr"). at 282.) "[W]as your relationship [with Ms. Levy] what people would consider an affair?" (Id. at 286.) "Was there any change in your relations [with Ms. Levy] during the period October 2000 to the time she disappeared in 2001?" (Id. at 287.) "Was there any physical intimacy of any kind in your relationship?" (Id. at 289.) "Did Ms. Levy ever spend the night in your apartment?" (Id. at 293.) "[W]ere you ever concerned that any aspect of your friendship or conduct with [Ms. Levy] might become public knowledge ... did Ms. Levy ever tell you that she had told anyone about the nature of your friendship with her?" (Id. at 303.) "Aside from [Ms. Levy] talking to you about her career, did she talk to you about other matters as well, over the time you knew her?" (Id. at 313.)

4. Plaintiff also alleges that whatever Condit now says regarding the relationships cannot bear on the causation issue as to reputation damages because that would only concern what was reported, not what was actually true. This argument is clearly erroneous, as damages may be

Unfortunately for plaintiff, he opened that door himself by filing this lawsuit, the Court cannot allow plaintiff to walk through freely while holding defendant in check at the gate. The allegedly slanderous statements at issue indicate not only that Condit was involved somehow in Ms. Levy's disappearance, but that he was involved due to his sexual relationship with her and his need to end that relationship. In order for defendant to promote a defense of substantial truth, he must be allowed to show the character of the relationship in so far as it may have been a strain on Condit, causing him to complain about it to people who would take matters into their own hands. Defendant Dunne is wholly within his rights to assert such a defense, contrary to plaintiff's argument, *supra*, because whether he admitted falsity in his deposition is a matter for the finder of fact. This Court sees no obvious assertion in Dunne's deposition that the story was not substantially true, only that the storyteller, the horse whisperer, was not wholly trustworthy. Therefore, the Court declines to find that Dunne admitted falsity as a matter of law and leaves that determination to the finder of fact.

Further, defendant is allowed to impeach plaintiff via plaintiff's false statements to others regarding this matter. *See Sec. & Exch. Comm'n v. Thrasher*, No. 92 Civ. 6987, 1996 WL 94533, *1 (S.D.N.Y. Feb. 27, 1996). Such impeachment could support a defense of substantial truth and also contradict plaintiff's truthfulness at trial. Because of the broad standard for discoverable evidence cited above, defendant cannot be blocked from inquiry into relevant areas reasonably calculated to lead to admissible evidence. Fed. R.Civ.P. 26(b)(1). Further, the Court agrees that, because of plaintiff's contradictory accounts of his relationship with several women, presenting this discrepancy "to a jury is directly relevant to whether Condit's denials

concerning Chandra Levy deserve any weight at all." (Def.'s Mem. at 20.)

Plaintiff is correct, however, that information regarding Condit's sexual relationships are not relevant to defendant Dunne's state of mind to the extent that Dunne did not know that information at the relevant time. Relevant to Dunne's state of mind is only what he was aware of at the time he made the statements at issue. Therefore, any inquiry on discovery into Condit's sexual relationships is limited to information relevant to Dunne's possible defense of substantial truth, mitigation of damages, and impeachment as to the truthfulness of plaintiff. To be perfectly clear and allay plaintiff's fears of overly salacious discovery, no fishing expeditions will be tolerated by this Court, nor by Magistrate Judge Ellis who will supervise the parties' depositions.

*ii.   Condit need not identify specific phrases in the allegedly defamatory statements that criminally implicate him in the disappearance and death of Levy.*

▆ Defendant argues that though under defamation law, allegedly defamatory statements are to be examined as a whole, in order to do so, the parts must be examined as well. Therefore, defendant requests that Condit be compelled to point out specific phrases within the whole of the statements at issue that criminally implicate Condit in the disappearance and death of Ms. Levy.

Plaintiff argues that defendant's request would improperly require Condit to provide a legal conclusion regarding the defamatory nature of the statements. Further, plaintiff reasserts that under defamation law, the statements are to be evaluated as a whole, not line-by-line.

mitigated by plaintiff's own actions causing damage to his reputation. *Munafo v. Metro. Transp. Auth.*, Nos. 98 Civ. 4572, 00 Civ. 134, 2003 WL 21799913, at *24 (E.D.N.Y. Jan. 22, 2003) ("[W]here plaintiff claims reputational injury, defendants must be permitted to introduce specific evidence that the plaintiff's reputation has already been compromised.") (citing, *inter alia*, *Marcone v. Penthouse Int'l Magazine for Men*, 754

F.2d 1072 (3d Cir.1985)); *Weber*, 1997 WL 729039 at *2 ("Generally, when damages are sought for loss of reputation, the plaintiff's personal history is relevant and discoverable.") (citing 6 James Wm. Moore, et al., *Moore's Federal Practice* § 26.46[6] (3d ed.1997)). Thus, both publicly available information and Condit's private actions could have contributed to Condit's alleged reputation damage.

Plaintiff's argument is meritorious. Plaintiff is not required to make legal conclusions, nor separate out which parts of the long transcript and statements are specifically defamatory, so long as he alleges the statements taken as a whole are defamatory. *See Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 177–78 (2d Cir.2000); *Baker v. Los Angeles Herald Exam'r*, 42 Cal.3d 254, 228 Cal. Rptr. 206, 721 P.2d 87 (1986) ("[The] publication in question must be considered in its entirety; '[it] may not be divided into segments and each portion treated as a separate unit'") (citations omitted); (Pl.'s Opp'n at 9–10 (stating Condit did so allege and citing Condit's deposition transcript).) Rather, the finder of fact will determine whether the statements, taken as a whole, and in context, constitute slander. *See Condit*, 317 F.Supp.2d at 361 ("To determine whether a statement declares or implies a false assertion of fact," look to "both to the statement itself and to the context in which it was published.").

### iii. Condit's real property interests, financial, and employment information are discoverable

■ Defendant argues plaintiff has put this information directly at issue by alleging special damages arising from plaintiff's permanent impairment to obtain or maintain gainful employment. This is because Condit's real property interests and financial assets could be the real reason Condit has not sought employment in the last few years, rather than, as plaintiff alleges, that Condit did not seek employment because of a fear Dunne would publicly ridicule potential third party employers.

Plaintiff argues that defendant seeks this information improperly to gain insight into plaintiff and his wife's recent settlements of similar defamation cases against tabloid newspapers. Plaintiff also argues that the information is irrelevant because plaintiff does not claim a diminution in his net worth. Plaintiff finally states that this discovery is a slippery slope leading to disclosure of all plaintiff's assets.

As indicated by this Court during the November 4, 2004 oral argument on this issue, defendant's argument is meritorious because of the broad interpretation of relevance for discovery purposes, as stated above. (Oral Argument Tr. at 23, 27–28.) Plaintiff's argument that disclosure of his financial information will betray the confidentiality of other settlement negotiations, giving defendant a tactical advantage is specious, as many disclosures give opposing counsel tactical advantage. Because of the broad relevance standard, which should not be limited lightly, and plaintiff opening the door to his financial information as indicated by defendant, this Court finds the information in this regard sought during Condit's deposition relevant and discoverable. No privacy privilege is applicable here, as discussed, *supra.*

### iv. Court supervision of the depositions of both Condit and Dunne is necessary

It is clear to this Court that the parties would benefit from on-hand Court supervision of their depositions. Therefore, this Court refers supervision to Magistrate Judge Ellis, and any issues arising therefrom are to be decided by Magistrate Judge Ellis in a manner consistent with this Opinion.

Further, the parties are instructed to comply with FRCP 30(d)(2) governing depositions. The Rule states in pertinent part that "a deposition is limited to one day of seven hours" but that a court *must* allow additional time for discovery of relevant evidence, "for fair examination of the deponent or if the deponent or another person, or other circumstance, impedes or delays the examination." Further, the 2000 Advisory Committee notes to Rule 30(d) clearly state that only the time taken for the actual deposition, not breaks, counts toward the 7 hours, and that for good cause shown, the court should enlarge the time limit. Moreover, the notes state that the 7 hour time limit is merely a guide and that parties should work together to determine a fair time limit: "It is expected that in most instances the parties and the witness will make reasonable accommodations to avoid the need for resort to the court. . . . *Preoccupation with timing is to be avoided.*" (emphasis added). Finally, Rule 30(d)(3) provides for sanctions to be assessed if the

court finds a party or deponent has impeded, delayed or frustrated the deposition process. Therefore, the Court instructs the parties to conduct further deposition of plaintiff Condit, as supervised by Magistrate Judge Ellis in a manner consistent with this Opinion and their obligations as officers of the Court under FRCP 30(d).

> *v. Plaintiff's cross-motion for an order of protection barring defendant from inquiring into the issues discussed above is denied*

Pursuant to this Opinion, defendant is not barred from making relevant inquiries into plaintiff's financial information and sexual relationships. However, the parties are free to designate all or part of any information revealed during discovery as confidential pursuant to the parties' July 12, 2004, Consent Protective Order Governing Confidential Information. Further, the parties are able to move for a protective order on bases consistent with this Opinion. Magistrate Judge Ellis will entertain any future motions for a protective order arising out of discovery in this case.

### CONCLUSION

Defendant Dunne's motion to compel discovery pursuant to FRCP 37(a) is granted in part and denied in part. Plaintiff is hereby ordered to answer questions regarding his sexual relationships in so far as they are relevant to a defense of substantial truth, mitigation of damages, or impeachment of plaintiff. The specifics are to be determined by Magistrate Judge Ellis while supervising future depositions in a manner consistent with this Opinion. Further, plaintiff is ordered to answer questions regarding his financial information as it is relevant to defendant's claim discussed above. Plaintiff need not answer questions regarding which specific portions of defendant's allegedly defamatory statements criminally implicate plaintiff in the disappearance and death of Ms. Levy. Plaintiff's cross-motion for a protective order barring defendant from inquiring into the above is denied, however, the parties are free to designate all or part of any information revealed during discovery as confidential

pursuant to the parties' July 12, 2004, Consent Protective Order Governing Confidential Information. The parties may also move for a protective order based on any future discovery. Magistrate Judge Ellis will entertain any future motions for a protective order arising out of discovery in this case.

**SO ORDERED.**